This is a case that was denied by the immigration judge and also denied by the Board of Appeals on what we contend are clearly erroneous grounds. Namely, the most important ground upon which the petitioner relies is the I.J.'s finding that the petitioner allegedly testified inconsistently in court as compared to his prior statements before the asylum office. I don't know if the judges looked at the record, but a very important part of the transcript appears to be missing. Somewhere right after the beginning of cross-examination where the transcriber says that the end of tape two is blank. But the petitioner had objected to the introduction of the asylum officer's notes and referral during the course of testimony. And one of the main reasons that he objected is that the asylum officer was not made available for cross-examination, which was very important in this case because of the manner in which the notes were taken. I say this because if you look at the notes, you will see that they are very, very concise in that they're not even, even though they're typed, which is helpful, they're not in full sentences. And the petitioner's statements during the interview are written as pretty, as pretty much monosyllabic responses. And at heart here is, did the petitioner testify to membership in a political group called the Georgia National Front, or did he not during the time of the asylum interview? Now, on his application, he clearly states he participated in a political group. In the course of the proceedings, he articulated with greater detail, because he was asked, about his participation, about the nature of the group, its goals and aims, and what kind of relationship he had with the group. But during the asylum interview, from what we can tell on the notes, the only thing he was asked was political membership slash participation slash, and then a semicolon response, no. There is absolutely no way to glean from the record whether he was asked, well, if you didn't support it, were you a member, or some other sort of follow-up question, keeping in mind that the asylum interview process is not one which the applicant simply states out his story for an hour and then waits for the officer to make some sort of conclusion. It is the officer's job to elicit the questions from the applicant. So despite the questionable nature of the notes, the fact that the officer was not made for cross-examination, the I.J. relied upon his alleged failure to explain membership in the group or state membership in the group as a basis upon which to find him incredible and inconsistent, and that was improper. There was also some other basis of incredibility which was improper. For instance, the length of his detention. Was it exactly 24 hours, or was it closer to the 19 hours to which he testified to? Again, looking at the asylum officer's notes, although the respondent appears to be asked, how long were you detained, the answer appears to be 24 hours. And thereafter, the officer crafts all of his questions regarding that detention by first typing during the 24 hours, you know, what happened or what went on, and then it looks like the applicant, the petitioner, had answered him. But it's very clear from his testimony during the course of the proceedings, very consistent, both on direct and cross-examination, that he discussed this 24-hour period in general terms. He did not mean that he was watching the clock. We have a problem with the phone. The screen says the call was just now. No, I didn't see your school. OK. It's this encryption off on the screen. Does that mean anything? Yeah, I've been able to see you all the time. OK. Did the screen go blank? Yes. Am I there now? You're there. OK. All right. And so basically, our point is that this difference of a few hours when the petitioner described what happened to him, the interrogations, the beatings very consistently, is not the kind of mistake upon which an incredibility finding is based or is a proper basis for. Another area which the judge latched onto was this November 2001 incident. That seems the most serious one to me to completely eliminate discussion of that third one, which was really what, as I understand, made him decide to leave. This is true, Your Honor. However, again, if you look at the notes, the way that the petitioner was answering during the interview was not in a chronological order. And when he was asked by the asylum officer somewhere in the beginning of the interview following the discussion about his October 99 arrest, did anything else happen? He answered no. But then when he was asked the question, why did you leave, he himself began to offer, well, in June of 2001, this incident occurred and he gave details. And he then was asked, where did you live during certain periods of time? And he says that he was in one village between June, in fact, he says that he lived with relatives until November 2001. And I think the natural question for the officer would have been, well, why did you leave in November 2001? That would have then given the petitioner some signal that it is now time to discuss the events of November 2001. But the officer didn't ask him that. And I'm referring to the record at page 150. So I think it's clear from the way the petitioner answered, especially during the testimony in court, that he was waiting to be asked a particular question. And then immediately responded to that question as fully as he could. Despite the fact that the IJ did not appreciate his manner of talking, he had a bit of a jocular tone. He made some jokes. He tried to ease his own tension by making some jokes, but that didn't mean he didn't take the proceeding seriously. And the judge instead penalized him for giving too much information. And then when she ordered him to just answer the question, don't don't tell us anything extra, when he would say yes or no, she would then fault him for not giving enough of an answer. I think I'll reserve the rest of my time. OK. Good morning, Your Honor. May it please the court. My name is Andrew McLaughlin and I represent the respondent attorney general of the United States in this case. Let me first pause for a moment and observe that the first observation made by my sister counsel regarding the omission from the transcript has been there the entire time. It was not raised to the board, nor was it raised in her brief to this court. So I'm not exactly prepared to respond to it, nor did I respond, nor was it responded to in the brief in this case. Well, I'm not sure what you're referring to. So the omission in the transcript, there was a place in the transcript where it says there's something missing from the tape here. There's a point where they back they ran back the tape to play back something. And then the transcriber notes in the transcript that there's obviously something missing here because it jumps into something else immediately after that. So the transcriber right on the face of the transcript that counsel had in preparing her brief for the board and in preparing her brief for the court contains that notation. But the first time she's raised it to this court is this oral argument. Okay. I just wanted to note that at the. Okay. Just getting to the bases that the IJ gave for making an adverse determination. It strikes me that 19 hours versus 24 hours is not a material difference. And that he also explained that. He had said he stayed overnight, so I don't quite get the government's position that that would be a basis for an adverse credibility determination. Your Honor, the government's position is that in the context of the record of this case and the test that you were required to apply in this case is whether or not the record as a whole compels the conclusion that this person was testifying credibly, that the claim was credible. So you have to look at the entire record and the entire situation. And this IJ did a great job of outlining all of the reasons that were on her mind when she was making this determination. The central reason, as Judge Huggins observed, the central reason was the omission of the November 2001 incident. But the rest of it added up to something. And it's not like it's nothing on the record. And many of those things, I mean, that is a central incident. So the question of whether or not he had testified consistently regarding such a central incident is worthy of discussion. And if the IJ is caused to pause by that, it's a factor that needs to be added into that calculus. Can we talk for a moment about the November 2001 incident? If you go through the litany of reasons why this Court has found things not to be sufficient to permit an adverse credibility determination, none of those are present in this situation. You have a situation where there's no question that what's there is inconsistent. There is no mention whatsoever of a beating that took place in November of 2001. And I don't think there's any dispute that there is no such mention. So we have inconsistency. Is it central to the claim? Was he ever asked what were the incidents in which you were beaten? He was asked that question. And then he was asked, why did you come to the United States? Why did you leave Georgia? This is the incident, the single central, most important incident that caused him to leave Georgia and come to the United States. And yet it wasn't mentioned in response to either of those questions. And when the immigration judge. Now, look, do we have any do we have any cases that say that an omission as opposed to an affirmative inconsistency like the failure to state something in testimony for the IJ that was said in an application that that's ground for adverse credibility? Yes, Your Honor. You have many such cases. The one that comes to mind is one of the same cases. And I'm just not sure which of the same cases it is. But the question was an omission from the asylum application versus something that was testified to in the testimony. And in that case, the omission in the asylum application was held to be sufficient. Well, I understand that if something's not in the asylum application, but is in the testimony that that type of omission. But if something's in the application and then other things are said in the testimony, but not an item that's in the application, my question was, do you have any case which is parallel to that? I believe there are such cases. I'm certain that there are such cases. I don't recall off the top of my head which ones they are. Your Honor. I can provide those in a supplemental authorities afterwards, if you prefer. I didn't notice anything in your briefs on that line specifically. I don't recall there being anything addressing that specifically in the brief. No, Your Honor. Was that incident mentioned in his application? It was. And so it seemed peculiar to me that in the interview, this was not asked by the interviewer. Well, the peculiar thing was the interviewer was trying to be open and allow Mr. Balaxade to tell his story. So he said when he got to the end of his description at one point, he said, OK, was there any other time you were harmed? And Mr. Balaxade said no. So the interviewer stops and thinks, OK, well, I guess I can move on now because you've just told me that your asylum application isn't true on that point. So then he says, OK, why did you come to the United States? Now, keep in mind at this point, Mr. Balaxade had not mentioned being beaten in June of 2001 or being beaten in November of 2001. So in response to the question, why did you come to the United States? All of a sudden, Mr. Balaxade remembers that he was beaten in June of 2001 and describes the June 2001 incident. But he never mentions November 2001, even though this is an incident that caused him to come to the United States. He was shot at. He feared for his life. And then in the immediate in the in the notes and the immediate page following, I think that's page 150 in the record. He was he was asked two more general questions. He said, is there anything else relevant that you want to tell me about? Is there anything else I need to know? He asked those two questions at the end. And Mr. Balaxade said no. In both circumstances, having described the June incident. Didn't follow up with I went into hiding, didn't follow up that I was in bed for for a month, didn't follow up with when I came back, I was beaten up again. I was harmed in that occasion. Somebody shot at me. I feared for my life. That's why I left the United States. None of that appears in a statement to the asylum interview. So what does that leave you? That leaves you with an inconsistent statement that's central to the claim that clearly isn't minor, that he had a chance to explain and his explanation to the. What is the inconsistent statement? You mean an inconsistent omission? That's correct, Your Honor. OK, the statement was to be precise. That's back to the question I first asked about. So what we have is an omission in the asylum interview. I would say it's more than that. He was specifically asked the question, were you harmed in any other way? And said, no. He was specifically asked if there's anything else you want to tell me and said, no. Is there anything else relevant to this claim? And said, no. Those are inconsistent statements when he is now saying that there is something else and that there was something else at the time that he should have said, yes, it's an omission. But the fact that he's denying that those things existed at the time under oath in the language that he's most familiar with is telling. And it is a basis that supports the immigration judge's decision. And that's the only question. Could a reasonable fact finder look at that and say, that's pretty significant. That causes me to pause. That causes me to think that I can't believe I don't know what to believe about your testimony. Your testimony is not worthy of credit. Your claim is not worthy of credit. It is not creditable. And therefore, you have failed to testify as you're required to do. But let's look at the explanations that were, in fact, given to the asylum to the asylum officer. The asylum officer said, wait a minute, you're now testifying that you were beaten by somebody in June of 2001. That I just asked you whether you were beaten and you said no. His response was, I forgot. Not only did he forget the event that caused him to come to the United States in November of 2001, he had forgotten the June event as well. The concept of this, all of the all of the possible reasons for which you could have to explain your asylum application, why you didn't do something. All he was able to tell the immigration officer was, I forgot. All he was able to tell you is, well, that question wasn't precisely asked and I was trying to be precise in my answers. All of those rationales that are available to you out there don't apply in this case. In the context of a proceeding in which the alien was being evasive, not answering questions. The questions that he did answer were, seemed to be trying to give the answer that somebody wanted regardless of truth. All of those things is what the immigration judge was observing. And in that context, centered around this central event that he failed to mention his involvement with the Georgian party. And he failed to mention this November event, not to mention failing to mention until the second time around. The June event is sufficient to allow a reasonable fact finder conclude that the testimony, that the claim as a whole is not credible and deny the claim for asylum. All right. Thank you, counsel. Your honors, if I may address some of the issues counsel brought up. First of all, I think it is clearly erroneous to rely on speculation and conjecture to think of what this applicant, the petitioner, thought during the asylum interview. He was unrepresented by counsel. We don't have the testimony of the asylum officer regarding the manner in which he asked the questions, how much time he allowed the petitioner to answer the questions he did. And in fact, other relevant points that are necessary in determining how this interview was conducted. Now, we have another case in which the asylum officer was called to testify with regard to that interview. Do you have any indication how frequently that's done? I can only tell you that whenever, in my own experience, an asylum officer's notes are introduced and we, or the petitioner disagrees that he did not say what the government is alleging, he said, typically we request the presence of the officer for cross-examination. All right. Okay. In answer to the other question, in our brief, we cited the case of Aguilera Cota V.I.N.S. 914 F. 2nd, 1375, which this court has found that omissions are not a proper basis upon which to find a credibility finding in the context of where other testimony is credible. Here, the judge made a lot of leaps in finding this petitioner to be incredible, and therefore, you cannot look at the cumulative reasons that she found and lump them all together and say he is incredible. What about the example about the special prosecutor versus whether he was called forth before the investigator working for the prosecutor's office? He explained this difference, that he had never said to the asylum officer that the actual prosecutor general spoke with him. And from the notes, you cannot glean whether he was asked who from that office spoke with you or whether the asylum officer really delved into that area too much. And during a testimony, he explained it wasn't the actual prosecutor general. It was an investigator from there. And yet, the judge used that as a basis to find him incredible. There's nothing in the record to support it. There are lots of different so-called inconsistencies which, when looked at closely, argued in our brief, are not inconsistent that she relied upon to deny the claim, which are cumulatively insufficient basis to find him. All right. Thank you, Counsel. The case just heard will be submitted, and we'll proceed to the third case on the calendar. We have had one case which has been removed, another submitted on the briefs.
judges: Hug, Tashima. Gould